14910

CHESTERFIELD COUNTY v. STATE HIGHWAY·DEPARTMENT OF SOUTH CAROLINA *ET AL.*

(3 S. E. (2d), 686)

20

22

24

September, 1938.

Report of Special Referee follows:

On June 15, 1928, Chesterfield County issued and sold for par and accrued interest $400,000.00 of 4¾ per cent. bonds, maturing in annual installments of $40,000.00, payable on January 15th in each year from 1930 to 1939, inclusive, in order to provide the sum of $400,000.00 to comply with a highway reimbursement agreement entered into by Chesterfield County and the State Highway Department of South Carolina, on April 19, 1928, pursuant to the provisions of the Acts of the General Assembly of South Carolina authorizing counties and the State Highway Department, in

order to accelerate the construction of highways, to enter into agreements by which the county undertakes to advance funds to the State Highway Department to be used for the construction of highways in the county, and the State Highway Department agrees to reimburse the county for the funds so advanced.

About July 1, 1928, the proceeds arising from the sale of these bonds were placed to the credit of the treasurer of Chesterfield County in South Carolina National Bank in Columbia, but shortly thereafter the county treasurer transferred all of the funds to the Bank of Cheraw and Chesterfield County at Cheraw. Under the reimbursement agreement the funds to be advanced by Chesterfield County were required to be turned over to the highway department within sixty days after demand therefor, and on July 8, 1928, formal demand was made in behalf of the highway department for the entire $400,000.00, followed by further demands on August 2, 1928, and August 9, 1928, but the county treasurer only remitted $150,000.00 on August 10, 1928, retaining the balance of the proceeds of the bonds on deposit to his credit in the bank at Cheraw. On or about November 12, 1928, and while this balance remained on deposit to the credit of the treasurer of Chesterfield County, the bank failed, and the highway department has only received the $150,000.00 remitted by the county treasurer on August 10, 1928, and the additional sums of $36,250.00, subsequently realized from dividends on the bank deposit, and $4,959.12, the proceeds of a special tax levy of two mills in Chesterfield County for the year 1931, made under circumstances to be later referred to.

Under the authority of certain Acts of the General Assembly, to be later discussed, the highway department has purchased all installments of the bonds maturing up to this time and is holding the bonds purchased as a claim against Chesterfield County, except the proportionate part thereof represented by the $150,000.00 remitted to the highway department by the county treasurer.

On or about March 24, 1936, Chesterfield County, claiming that under the reimbursement agreement between the county and the highway department and the statutes applicable thereto the payment of the bonds was an obligation of the highway department and not of the county, instituted an action against the State Highway Department in the original jurisdiction of the Supreme Court, seeking a writ of mandamus to require the highway department to turn over and deliver to the county all bonds paid by the department. The Supreme Court denied the application for a writ of mandamus (181 S. C., 323, 187 S. E., 548, 550), on the ground, as stated in the opinion of the Court, "that there are varied and complex questions involved, from which differing conclusions can be deduced, which ought properly to be tried in a Court of law, and not determined by the summary process of mandamus."

After the denial of its application for a writ of mandamus Chesterfield County, making substantially the same contentions as made in its application for a writ of mandamus, instituted the present action in the Court of Common Pleas against the State Highway Department of South Carolina, M. S. Watson, treasurer of Chesterfield County, and T. W. Eddins, auditor of Chesterfield County, asking to have all of its issues of $400,000.00 of bonds, heretofore paid or hereafter paid by the State Highway Department, adjudged to be the property of Chesterfield County and required to be delivered into its possession. It also seeks in the present action to have the auditor and the treasurer of Chesterfield County enjoined from levying and collecting an annual tax of two mills placed upon all taxable property in Chesterfield County by a provision appearing in the State Appropriation Act in each year from 1931 to 1936, inclusive. After the commencement of the action J. F. McBride, as a property owner and taxpayer of Chesterfield County, applied to be made a party in his own behalf and in behalf of all other property owners and taxpayers of Chesterfield County. The

application of J. F. McBride having been granted by an order of the Judge of the 4th Circuit, dated December 12, 1936, the pleadings have been amended accordingly, and J. F. McBride in his own behalf and in behalf of all other property owners and taxpayers of Chesterfield County has been made an additional party defendant.

Chesterfield County predicates its alleged right to have the bonds adjudged to be its property and required to be delivered into its possession upon the theory, for the present somewhat generally stated, that funds pledged under authority of law for the payment of the bonds, as well as funds actually belonging to the county, have come into the hands of the highway department, and that the highway department has been required by various Acts of the General Assembly to assume the payment of the bonds. As to the annual tax of two mills placed upon all taxable property in Chesterfield County by the State Appropriation Acts from 1931 to 1936, inclusive, it is contended that the tax has been unconstitutionally imposed, for reasons to be later discussed. The State Highway Department admits that it is liable for the payment of the bonds to the extent of the $150,000.00 remitted to the department by the county treasurer on August 10, 1928, but denies that it is liable to any greater extent, and it also denies that the two mills annual tax levy is unconstitutional. The defendant, J. F. McBride, admits the allegations of the complaint and makes common cause with the plaintiff. The defendants, M. S. Watson, treasurer of Chesterfield County, and T. W. Eddins, auditor of Chesterfield County, have failed to answer and are in default.

The facts are not in dispute, and the disposition of the case depends wholly upon questions of law, which to a very large extent involve the proper construction of applicable statutes. The parties, therefore, have entered into a written stipulation as to the facts, and they have further agreed orally that anything appearing in the exhibits attached to the pleadings, or in the record for the Supreme Court in the

former application for a writ of mandamus, may be taken as a part of the stipulation as to the facts. In relation to the facts, however, it may be of some moment to state that although the reimbursement agreement between Chesterfield County and the State Highway Department, entered into on April 19, 1928, provided for the construction, at an estimated cost of $400,000.00, of a section of Highway Route No. 1 and a section of Highway Route No. 9, both to be graded and surface treated, yet in 1931 the State Highway Department built these sections of road, using a much higher and more expensive type of construction, at a total cost of $1,401,002.52, financed with the $150,000.00 previously advanced by Chesterfield County, and $1,251,002.52 taken from the construction funds of the State Highway Department.

The reimbursement agreement between the county and the State Highway Department having been made wholly under statutory authority, it seems obvious that the rights conferred and the obligations imposed must be measured by the several statutes authorizing and regulating these agreements; and since the county points to many provisions of these statutes, by which it is contended that the county is relieved of the obligation of paying any part of the bonds and the State Highway Department is required to pay them in full, a somewhat detailed and perhaps tedious statement of the pertinent parts of the statutes claimed to have that effect is necessary. It is also necessary to state the provisions of certain other statutes giving special treatment to these reimbursement bonds of Chesterfield County, because the State Highway Department has acted under them in acquiring and handling the bonds, and the constitutional validity of some of this legislation is attacked by the county.

By an Act commonly referred to as the "Pay-As-You-Go" Highway Act, approved March 21, 1924 (33 Stat., 1193, Secs. 5926-5933, Code of 1932), a comprehensive plan was adopted for constructing and financing a connected system

of State highways, the highways to be constructed in each county of the State being set forth in detail. Motor vehicle license taxes and a tax of three cents a gallon on sales of gasoline were imposed, and it was provided that the highways should be constructed and maintained from any amount available from automobile license taxes, federal aid, and gasoline taxes. It was further provided, for the year 1924, that from the three cents a gallon gasoline tax one cent should be paid into the State treasury to the credit of the general fund, one cent to the counties, and one cent to the State Highway Department, and that after December 31, 1924, all gasoline taxes, automobile license taxes and federal aid should go to the State Highway Department for the purpose of constructing and maintaining the highways. The State Highway Department was required to reimburse counties for hard-surfaced roads in the State system already constructed by the counties, and for that purpose it was required to determine the value to the State as of January 1, 1925, of every such hard-surfaced road and to make payment to the various counties of the amounts so determined, after first deducting therefrom all federal aid and the cost of bridges and grading, such payments to be made from the funds provided for construction. The State Highway Commission was also authorized to permit any county or counties to construct any of the roads and bridges designated for construction, and to make an agreement to reimburse the county or counties in the same manner as provided for reimbursing counties for hard-surfaced roads already constructed.

By Act approved March 23, 1925 (34 Stat., 51), the Act of 1924 was amended so as to increase the gasoline tax from three cents a gallon to five cents a gallon, of which three cents was required to be paid over to the State Highway Department for construction of State highways and two cents a gallon was required to be distributed to the counties, on the basis of the amount of license fees collected in the county

from automobiles and trucks, to be used by the county authorities exclusively for the construction or maintenance of roads not in the State Highway System.

By Act approved April 2, 1926 (34 Stat., 1001, Secs. 5937-5946, Code of 1932), more definite and comprehensive provisions were made in relation to financing and constructing highways under reimbursement agreements between the State Highway Department and counties or road districts. Chesterfield County and several other counties were excepted from the provisions of this Act, but by an Act approved March 10, 1928 (35 Stat., 1252), the exception as to Chesterfield County was repealed. By this Act of 1926 counties were authorized to enter into reimbursement agreements with the State Highway Department and to issue bonds upon prescribed conditions for the purpose of raising money to pay the cost of constructing any highway or highways in the county embraced in the State Highway System. Sections 3 and 4 of this Act have such an important bearing upon the questions involved in this case that it is perhaps desirable to set them forth in full as follows:

"§ 3.  No bonds shall be issued under this Act by any county unless and until the proper officer or body of such county shall have previously entered into an agreement or agreements on behalf of such county with the State Highway Commission of South Carolina, whereby the State Highway Commission shall have agreed to reimburse and repay said county for the cost of constructing the highway or highways for which said bonds are to be issued as provided in Section 6 of the said Act approved March 21, 1924, as amended. The amount of the bonds to be issued shall not exceed the cost of constructing said highway or highways as estimated by the State Highway Commission or its chief engineer. If the actual cost of said work shall be less than the amount so estimated the proceeds of said bonds not used to pay said cost shall be placed in a special fund by the county treasurer and applied solely to the payment of the

principal of said bonds as said principal becomes due. For the purpose of said Act approved March 21, 1924, as amended, the value of said highway or highways as of the date or dates of completion thereof shall be deemed equal to the cost of said highway or highways. The county may, by the terms of said agreement or agreements, agree to advance to the State Highway Commission moneys necessary to construct the said highway or highways and the said Highway Commission may agree to construct said highway or highways and to reimburse and repay said county for all moneys so advanced; and the State Highway Commission and said county shall have all powers necessary to enable them to carry out said agreement or agreements. The State Highway Commission shall reimburse and repay said county as aforesaid out of the funds authorized by said Act approved March 21, 1924, as heretofore amended, to be used for the construction of the State Highway System. So much of said funds as may be necessary for the purpose of making such reimbursements is hereby pledged irrevocably for said purpose, except the money needed in order to carry out valid reimbursement agreements previously made pursuant to this Act. This pledge is hereby made a part of the contract between said county and the holders of said bonds. In fixing the time or times of maturity of the principal of said bonds the officer or officers authorized to fix said time or times shall consider the probable amounts to be received each year by way of reimbursement as aforesaid, and shall endeavor to arrange the times of maturity of said principal that the levy of a tax will not be necesary in order to pay said principal.

"§ 4. The full faith, credit and taxing power of each county issuing bonds under this Act are hereby irrevocably pledged for the punctual payment of the principal and interest of said bonds as such principal and interest become due. The county auditor of such county is hereby authorized and directed to levy annually on all taxable property in such county a tax sufficient to pay said principal and interest as they respectively become due, and the county treasurer of

such county is hereby authorized and directed to collect said tax and apply it to said purpose. But all moneys received by the county from the State Highway Department by way of reimbursement under the agreement or agreements above referred to shall be applied to the payment of said principal and to the reduction of said tax. There shall also be applied to the payment of said interest and to the reduction of said tax so much of the gasoline tax distributed to said county under Section 11 of said Act approved March 21, 1924, as amended, as may be necessary for the purpose of paying said interest, as it becomes due, notwithstanding anything in said Act approved March 21, 1924, as amended, providing for a different use of the gasoline tax so distributed. It is the intention of this Act that all bonds issued hereunder shall be direct and the general obligations of the county issuing them, payable primarily by means of said property tax."

By Act approved April 14, 1927 (35 Stat., 278, Secs. 5934-5936, Code of 1932), all additions made to the State Highway System by the Highway Commission since the passage of the "Pay-As-You-Go" Act, approved March 21, 1924, are confirmed and ratified; and it is also provided that when any additions have been made for construction, the cost of such construction, whether by reimbursement or otherwise, shall be charged to the allotment of the county or counties in which the project is located, and that such additions for construction shall not increase the annual percentage of construction funds available to each county as determined by the State Highway Department. This annual percentage of construction funds available to each county, as determined by the State Highway Department, is then listed, the percentage of Chesterfield County being 2.48 per cent.

By Act approved March 10, 1928 (35 Stat., 1294, included in Sec. 5939, Code of 1932), provision is made for paying counties the actual cost of highways or bridges constructed under reimbursement agreements, in the event that

the county has paid out in the construction of the highway or bridge, on monthly estimates or vouchers approved by the State Highway Engineer, an amount in excess of that specified in the reimbursement agreement.

For the purpose of more expeditiously completing the construction of the State Highway System, in 1929, the General Assembly passed an Act, approved March 14, 1929 (36 Stat., 670, Secs. 5947-5981, Code of 1932), generally referred to as the State Highway Bond Act, providing for alternative plans of financing the construction of State Highways, respectively designated "State Unit Plan of Financing" and "District Unit Plan of Financing," and authorizing the issuance of either State or highway district certificates of indebtedness. By Article 3, Section 8, of this Act (Section 5969, Code of 1932) it is provided that the entire amount of revenues derived from the gasoline tax and motor vehicle license tax, except such portion, if any, of the gasoline tax as shall exceed five cents a gallon, shall be turned over to the State Highway Department and paid out as provided by that section, and it is further provided that not more than thirty days prior to the beginning of each calendar year the State Highway Commission shall make an estimate of the revenues to be received during the next calendar year from the gasoline tax and motor vehicle license tax, and also an estimate of the amounts required for the following purposes, which estimated amounts are appropriated for such purposes, viz.: (a) The amount required for administrative expenses of the highway department for the calendar year, which shall not exceed $450,000.00; (b) the amount necessary in order to make the payments required by the Act to be made to or on behalf of counties, highway districts and bridge districts during the calendar year or during the first fifteen days of the next ensuing year; (c) the amount necessary to pay the principal and interest falling due in the calendar year or during the first fifteen days of the next ensuing year on certificates of indebtedness issued under the Act;

(d) the amount necessary to make the annual sinking fund payments required by the Act. By Article 3, Section 9, of the Act (Section 5970, Code of 1932), it is provided that out of the funds authorized by other provisions of the Act to be used therefor the State Highway Commission shall make payments or reimbursements as follows: (a) The appraised value of any hard-surfaced roads already in the State Highway System and constructed by any county, either before or after the passage of the "Pay-As-You-Go" Act of 1924, on the basis of valuation for hard-surfaced roads fixed by that Act, all unpaid obligations under this provision to bear interest at the rate of $4\frac{1}{2}$ per cent. per annum, payable semi-annually; (b) the amount which the State Highway Commission has agreed to pay as reimbursement for constructing highways or for money advanced therefor under agreements made with counties or highway or bridge districts after the passage of the "Pay-As-You-Go" Act of 1924, all unpaid obligations of the Highway Commission under this provision to bear interest at the rate borne by any bonds or other obligations issued by counties or highway or bridge districts for the purpose of obtaining funds advanced or used for the construction of highways, and such interest to be paid at or before the times when the interest on such bonds or other obligations becomes due. This section of the Act also contains a further provision, greatly relied upon by the plaintiff, reading as follows: "In any case where the portion of the gasoline tax which is required by laws enacted prior to this Act [chapter] to be distributed to counties has been lawfully pledged in whole or in part for, or is required by law to be applied in whole or in part to, the payment of the principal and/or interest of any bonds or other obligations, the State Highway Commission shall pay said principal and/or interest at or before the times when said principal and/or interest become due."

At its 1929 session the General Assembly passed another Act, approved March 16, 1929 (36 Stat., 107, Secs. 2505-

2511, Code of 1932), to further promote the new plan of financing highway construction. By Section 1 of that Act (Section 2505, Code of 1932) the gasoline tax is increased from five cents a gallon to six cents a gallon, and by Section 2 (Section 2507, Code of 1932) five cents a gallon of this tax is required to be turned over to the State Highway Department for its purposes, and one cent a gallon is required to be distributed to the counties (reducing the counties one cent a gallon), on the same basis as previously provided for the distribution of two cents a gallon to the counties, to be used by the counties exclusively for the construction and maintenance of county roads. By Section 3 of the Act (Section 2508, Code of 1932), out of the five cents a gallon allocated to it, and its other current income or funds, the highway department is required to make payments or reimbursements as follows: (a) The appraised value of any hard-surfaced roads or concrete bridges connecting with other states, then in the State Highway System and constructed by any county or counties either before or after the passage of the "Pay-As-You-Go" Act of 1924, on the basis of valuation of hard-surfaced roads provided by the "Pay-As-You-Go" Act of 1924 (Section 5928, Code of 1932), all unpaid obligations of the Highway Commission under this provision to bear interest at the rate of $4\frac{1}{2}$ per cent. per annum, payable semi-annually, or at the rate borne by any bonds issued by any county for such paving, but no payments to be made under this provision for roads constructed under reimbursement agreements referred to in Subdivision (c) of this section; (b) the amounts which the State Highway Commission, under agreements made with counties or highway districts after the passage of the "Pay-As-You-Go" Act of 1924, has agreed to pay as reimbursement for constructing State highways or for money advanced for that purpose, all unpaid obligations of the State Highway Commission under this provision to bear interest at the rate borne by any bonds or other obligations issued by counties or highway or bridge

districts for the purpose of obtaining funds advanced or used for the construction of State highways, but at the rate of 4½ per cent. per annum, payable annually, if the money advanced has been obtained from sources other than bonds or notes bearing a fixed rate of interest. Payments of interest under the foregoing provisions are also required to be made at or before the times when the interest on bonds or other obligations falls due, and the interest to be paid to counties or highway or bridge districts is required to be computed from the date of the approval of the Act (March 16, 1929), Subdivision (c) of this section of the Act (Section 2508, Code of 1932), strongly relied upon by the plaintiff, is as follows: "(c) In any case where the portion of the gasoline tax which is required by laws enacted prior to this Act [the 16th day of March, 1929], to be distributed to counties has been lawfully pledged in whole or in part for, or is required by law to be applied, in whole or in part, to the payment of the principal and/or interest of any bonds or other obligations, the State Highway Commission shall pay said principal and/or interest at or before the times when said principal and/or interest become due. The payments and reimbursements required by this section shall have priority over any other payments authorized or required by law to be made out of the gasoline tax or other current income of the State Highway Department."

By Act approved March 25, 1929 (36 Stat., 1042), the portion of the proceeds of the $400,000.00 of bonds of Chesterfield County remaining on deposit in the Bank of Cheraw and Chesterfield County at the time of its insolvency, together with all dividends payable or to become payable thereon, and all rights and causes of action in favor of Chesterfield County in relation to the deposit were transferred and assigned to the State Highway Commission, and all sums realized by the Highway Commission by reason of the assignment were required to be "applied on the contract between the Commission and Chesterfield County as an ad-

vancement of funds to the State Highway Commission under the said contract." Section 1. There were also other provisions, not particularly pertinent, in relation to the prosecution of any litigation deemed by the State Highway Commission to be necessary.

The first installment of $40,000.00 of the bonds of Chesterfield County having matured on January 15, 1930, and not being paid, Section 87 of the State Appropriation Act for the year 1930 (36 Stat., 1411, 1504), provided as follows: "The State Highway Department is hereby authorized and empowered to purchase such bonds of Chesterfield County, which were issued by said County on or about 15th day of June, 1928 (and now outstanding in amounts not exceeding $400,000.00), but said Department shall purchase only such bonds, including interest coupons, as have already matured and such as mature within one year from the approval of this Act, and the purchase of said bonds, including interest coupons, by said Department, shall be made without waiving any rights whatsoever, in law or equity, which the present holders of said bonds may have, and which by purchase or transfer, become vested in the State Highway Department and the State of South Carolina against Chesterfield County. The State Highway Department is authorized to purchase these bonds, and interest coupons, and take such assignments and transfers as shall vest in said State Highway Department and the State of South Carolina all the rights whatsoever that the bond holders now have, or at any time may have against Chesterfield County for the enforcement and collection of same. Some of the bonds not having been paid by Chesterfield County, it is the purpose of this section to prevent serious and irreparable harm being done to the credit of the counties of the State and to the State itself, by authorizing the State Highway Department to purchase any of said bonds when, and as they become due."

The State Appropriation Act for each of the years 1931, 1932, 1933, 1934, 1935 and 1936 also contained a provi-

sion substantially the same as the foregoing provision in the State Appropriation Act of 1930, but with the following proviso added thereto: "Provided, That there is hereby levied upon all the taxable property in Chesterfield County two (2) mills, which the auditor of said county is hereby required to levy and the treasurer of said county is hereby required to collect and remit the proceeds thereof to the State treasurer, who shall credit all amounts so received to the State Highway fund." Act May 9, 1931, 37 St. at Large, p. 463, § 86; Act April 4, 1932, 37 St. at Large, p. 1628, § 69; Act May 13, 1933, 38 St. at Large, p. 651, § 74; Act April 14, 1934, 38 St. at Large, p. 1687, § 74; Act May 14, 1935, 39 St. at Large, p. 562, § 75; Act May 29, 1936, 39 St. at Large, p. 1861, § 78.

Acting under the authority conferred by these provisions of the State Appropriation Acts for the years 1930-1936, inclusive, the highway department has purchased from the holders the $40,000.00 of bonds maturing on January 15th of each year, beginning with the year 1930, and of the $40,-000.00 of bonds so acquired in each year it has surrendered to Chesterfield County for cancellation $15,000.00, representing the proportionate part of the entire $400,000.00 to be advanced by the county under the reimbursement agreement actually remitted to the highway department by the county treasurer, but the remainder is being held as a claim against the county. Chesterfield County, however, insists that the highway department is under obligation to surrender for cancellation all of the bonds so acquired, basing its contention on grounds that will now be considered.

The bonds being issued and sold wholly by virtue of the authority of the county reimbursement Act of 1926 (34 Stat., 1001, Secs. 5937-5946, Code of 1932), and the bonds themselves containing a recital to that effect, it will be seen, by referring to the Act, that "the full faith, credit and taxing power" of the county were irrevocably pledged for the payment of the principal and interest, and that the bonds were

intended to be direct and general obligations of the county, payable primarily by means of a property tax. The State Highway Commission, however, was required by the Act to reimburse the county for all moneys advanced by the county to the Commission, pursuant to the reimbursement agreement previously made, out of the funds authorized by law to be used for the construction of the State Highway System; and so much of the highway construction funds as was necessary to make such reimbursement, except funds necessary to comply with prior reimbursement agreements, was irrevocably pledged for that purpose, and the pledge was made a part of the contract between the county and the holders of the bonds. The county authorities were required to reduce the amount of any property tax for the payment of the bonds by applying to the principal all payments by way of reimbursement received from the State Highway Department, and they were also required to reduce the property tax by applying, so far as necessary, the part of the gasoline tax distributed to the county (then two cents a gallon) to the payment of interest on the bonds.

When by the State Highway Bond Act, approved March 14, 1929 (36 Stat., 670, Secs. 5947-5981, Code of 1932), a new plan of financing the construction of State highways was adopted, and by the Act approved March 16, 1929 (36 Stat., 107, Secs. 2505-2511), the gasoline tax was increased from five cents a gallon to six cents a gallon, and the amount to be distributed to the counties was reduced from two cents a gallon to one cent a gallon, a provision was incorporated in each of these Acts (now contained in Section 5970, Code of 1932), to the effect that in those cases in which the gasoline tax previously required to be distributed to counties had been lawfully pledged, or was required to be applied in whole or in part to the payment of the "principal and/or interest" of any bonds or other obligations, the Highway Commission was required to pay such "principal and/or interest" at or before maturity.

At the time of the enactment of the provisions of the Acts of 1929 just referred to, it is not suggested that Chesterfield County had pledged its part of the gasoline tax as security for the payment of any obligation and the only law requiring its application to any obligation was the provision of the County Reimbursement Act of 1926 (Sec. 5940, Code of 1932), requiring it to be applied to the payment of the interest on the bonds issued to comply with the county's reimbursement agreement. It is, therefore, impossible to escape the conclusion that these provisions of the Acts of 1929 (now appearing in Section 5970, Code of 1932), only require the State Highway Department to assume the payment of the interest on the bonds after the effective dates of the Acts. The county construes these provisions of the Acts of 1929 to require the highway department to assume the payment of both principal and interest, but when consideration is given to the language used, as well as to the circumstances and the conditions plainly intended to be provided for, it seems impossible to give them the effect contended for by the county.

All the funds arising from the gasoline tax were funds belonging to the State, produced solely by the authority of the State, and the distribution of any part to the counties was a pure matter of grace, subject to the right of the General Assembly to make a different distribution or to discontinue making any distribution at all, but when it was proposed to reduce the amount to be distributed to the counties from two cents a gallon to one cent a gallon, obviously consideration was given to the fact that some of the counties either had pledged their part of the gasoline tax, or were applying it to the payment of some obligation under authority of law; and in order to meet this situation and to compensate such counties for the loss of the one cent a gallon, so as not to disrupt any plan of financing previously adopted, the highway department was directed to assume the payment of any obligation to which the gasoline tax had been previously pledged, or

was required by law to be applied. The language used appears to be perfectly appropriate to accomplish that purpose, and it is inappropriate to any larger purpose.

Bearing in mind that the matter being considered was the loss to counties of one cent a gallon of the gasoline tax, on account of the reduction of the distribution from two cents a gallon to one cent a gallon, the almost perfect justice with which these provisions, as thus construed, have operated in the case of Chesterfield County, is quite impressive. The certificate of the State treasurer, attached to the answer of the highway department as an exhibit, shows the amount of the gasoline tax remitted to Chesterfield County in each year from 1928 to 1936, inclusive, but since remittances for the year 1928 and a part of the year 1929 were at the rate of two cents a gallon, consideration will only be given to the years 1930 to 1936, inclusive, in which the remittances were at the rate of one cent a gallon. For these years the remittances were as follows: 1930, $16,896.46; 1931, $18,201.15; 1932, $14,559.17; 1933, $14,913.97; 1934, $19,514.87; 1935, $23,208.25; 1936, $25,769.52. The yearly average was $19,009.06, while the yearly interest on the $400,000.00 of $4\frac{3}{4}$ per cent. bonds was $19,000.00. On the other hand, if the construction for which plaintiff contends is adopted, the result is that in taking cognizance of a loss of revenue to the extent of approximately $19,000.00 annually, as to Chesterfield County, on account of the transfer of that amount of revenue to the State Highway Department, the action of the General Assembly has had the effect of requiring the highway department to assume an annual interest obligation of $19,000.00 and in addition thereto an obligation of $400,000.00.

Although it seems plainly apparent that no obligation is imposed upon the highway department in relation to the principal of the bonds of Chesterfield County by these special provisions of the Acts of 1929 (contained in Section 5970, Code of 1932), yet it does not follow that

the State Highway Department has no obligation at all in relation to the principal of these bonds. By Article 3, Section 9, Subdivision (b), of the Act approved March 14, 1929 (Sec. 5970, Subdivision (b), Code of 1932), and by Section 3, Subdivision (b), of the Act approved March 16, 1929 (Sec. 2508, Subdivision (b), Code of 1932), out of the funds therein designated the highway department is required to make payments or reimbursements to counties of all amounts which it has "agreed to pay as reimbursement for constructing * * * highways or for advancing money for said purposes"; and by the County Reimbursement Act, approved April 2, 1926 (Sec. 5940, Code of 1932), this money paid to counties by the highway department under reimbursement agreements is required to be applied by the counties to the payment of the principal of bonds issued by them to obtain funds to be advanced to the highway department under reimbursement agreements. If the highway department receives and withholds any of the funds thus required to be paid to the county for application to the principal of the bonds, clearly the highway department, at the instance of the county, ought to be required to so apply the funds in its hands.

The important fact should be noted, however, that the amount required to be paid by the highway department for application by the county to the principal of the bonds is definitely limited to the amount the State Highway Department, by the reimbursement agreement, has agreed to pay, and in ascertaining that amount it is obviously necessary to have recourse to the agreement itself and to the terms of the County Reimbursement Act, approved April 2, 1926 (Secs. 5937-5946, Code of 1932), under the authority of which the reimbursement agreement was made. By Section 3 of that Act (Sec. 5939, Code of 1932), it is provided that the county may agree to advance funds to the State Highway Commission to construct highways, and the Highway Commission may agree to construct the highways *"and to reim-*

*burse and repay said county for all moneys so advanced."*
By referring to the agreement itself, attached as an exhibit
to the answer of the State Highway Department, it will be
observed that the obligation assumed by the highway depart-
ment by the terms of the agreement is *"to reimburse and re-
pay the county for all moneys so advanced."* It, therefore,
seems too plain to admit of any doubt that the obligation of
the highway department either to pay or to furnish money
for paying the principal of the bonds is expressly limited to
the amount actually advanced by the county under the reim-
bursement agreement.

The language used, both in the statute and in the reim-
bursement agreement, is so plain and definite as to leave no
room for doubt as to its meaning, yet even if it were of
doubtful import, it would need very compelling considera-
tions to justify a construction having the effect of requiring
the State Highway Department to reimburse the county for
money which it had agreed to advance but had withheld in
violation of the agreement. As said by the Supreme Court
in passing on the petition for rehearing in the mandamus
proceeding (181 S. C., 323, 187 S. E., 548, 550) : "There
can be no question that the legislation embodied in that sec-
tion, and allied acts, was predicated on the assumption that
the reimbursement agreements therein provided for would
be faithfully performed by the county entering into it, and
the money contracted to be advanced to the commission
would be so advanced."

In further support of its claim, it is contended by the
county, as the contention is understood, that by vir-
tue of the previous practice of the State Highway
Department of prescribing a percentage allotment of its total
construction funds to each county, together with the passage
of the Act of April 14, 1927 (35 Stat., 278, Secs. 5934-
5936, Code of 1932), taking cognizance of this practice and
stating the percentage of the total cost of the State Highway
System available to Chesterfield County, as determined by
the State Highway Department, to be 2.48 per cent. Ches-

terfield County was vested with a proprietary property right in 2.48 per cent. of the total construction funds coming into the hands of the highway department; and that since 2.48 per cent. of the construction funds heretofore received by the highway department is more than ample to extinguish the bonds, it is under obligation to apply the funds of Chesterfield County so received to the payment of the bonds. This contention, however, seems clearly untenable.

The so-called allotment of the construction funds to the various counties on a percentage basis was no more than a mere administrative practice of the highway department for the more convenient and equitable handling or budgeting of its construction funds, and it could not have the effect of vesting in the county an inviolable property right to any of the funds, nor could recognition of the practice by the Act of 1927 have that effect, since the Act at most merely regulates the conduct of the State Highway Department and does not create any contractual right (*Phelps v. Board of Education,* 300 U. S., 319, 57 S. Ct., 483, 81 L. Ed., 674) ; yet if the contrary is conceded the indisputable fact is that the county has already had its property. This percentage of the funds shown as available to Chesterfield County was of course only available for the construction of State highways in the county by the State Highway Department, and the uncontradicted affidavit of the secretary and treasurer of the highway department, attached to the answer of the department as an exhibit, shows that the total percentage of State highway construction funds expended up to June 30, 1936, for construction in Chesterfield County was 3.918 per cent. of the total expenditures in the State, 1.438 per cent. in excess of the 2.48 per cent. stated to be available to Chesterfield County by the Act of 1927. Furthermore, it would seem that the practice of making percentage allotments of which the Act of 1927 takes cognizance, necessarily has been superseded by the later enactments contained in Section 5971, Code of 1932, charging the Highway Commission with the

duty of determining and arranging the order of the construction work in a fair and equitable manner among the counties, and by the later provisions contained in Section 5974, Code of 1932, charging the Highway Commission with the duty of completing the construction of the State Highway System within the period of time contemplated by law in an orderly and economic manner.

If the several statutes considered have been properly construed, the conclusion necessarily follows that no obligation has been imposed upon the State Highway Department, as contended by the plaintiff, to pay in full both the principal and interest of the county's bonds, but if it be conceded that the purport of these statutes has been misconceived, yet the different conclusion which plaintiff deduces from its contrary construction of these statutes does not at all follow, as may be plainly demonstrated by a test of plaintiff's contentions from another approach.

The county in effect contends that by these various statutes a definite interest in funds has been granted to the county by the State, thereby vesting a right of property in the county, and creating an inviolable contract between the State and the county which cannot be superseded, withdrawn or in any way impaired; and based upon the assumption that the county has thus acquired a contractual, property interest in enough of the funds available for the construction of State highways to pay the bonds, and that these funds have come into the hands of the State Highway Department, it is said to follow that when the bonds also come into the hands of the highway department the county has a right to require the application of these county funds to the extinguishment of the bonds. For these reasons it is insisted that Section 87 of the State Appropriation Act of 1930 and the similar provisions contained in the State Appropriation Acts for subsequent years, purporting to authorize the State Highway Department to purchase the bonds and hold them as a debt against Chesterfield County, are unconstitutional and

ineffective, because they impair the obligation of a contract and deprive Chesterfield County of its property without due process of law.

Whatever contractual rights a private individual ██ might have under similar circumstances, the assumption that the county has similar contractual rights and has acquired a proprietary property interest in any of the funds in the hands of the State Highway Department, which the department must apply to the payment of the principal of the county's bonds, fails to take into account the legal relation existing between the county and the State. All of these funds were raised under the authority of the State and were State funds, and even if the State appropriated or apportioned some of the funds to the county for administrative purposes, and directed some special application of the funds, it was not equivalent to a contract between the State and the county, in the sense that a contract might arise between the State and a private individual, so that the State could not make some different disposition of the funds. The county is but an agency or arm of the State for governmental purposes, and privileges conferred upon counties and grants to them by the State, such as those here said to exist, are merely for the more convenient performance of the State's governmental functions, and they may be withdrawn at the pleasure of the State without in any way impairing the obligation of a contract or depriving the county of its property without due process of law, as will be readily apparent from a brief consideration of a few of the many authorities on the subject.

As to the nature of counties and their relation to the State, in 15 C. J., 388-399, it is said: "Comprehensively considered, a county is an involuntary political or civil division of the State, created by statute to aid in the administration of government. Separating this definition into the elements that compose, it, and considering a county from the standpoint of its distinguishing characteristics, the authorities unite in holding that a county is a local, legal, political sub-

division of the State, created out of the territory of the State, and that it is but an agency or arm of the State, created, organized, and existing for civil and political purposes, particularly for the purpose of administering locally the general powers and policies of the State."

In *Edgefield County v. Georgia-Carolina Power Company,* 104 S. C., 311, 88 S. E., 801, 806, it is said: "The county is but another manifestation of the state; it is an arm of the state." In that case the county brought an action complaining of the unlawful raising of the water of a creek so as to obstruct certain highways and approaches, and it was observed that although the State by statute had committed to the county full jurisdiction of the highways in the county, yet the State had the power to supersede the will and action of the county, and to permit the highways to be overflowed without any right of the county to complain.

In *Park v. Greenwood County et al.,* 174 S. C., 35, 176 S. E., 870, 871, the Court quotes with approval from 1 Cooley's Constitutional Limitations, 393, the following as to the relation between the State and its subordinate governmental agencies: "The creation of municipal corporations, and the conferring upon them of certain powers and subjecting them to corresponding duties, does not deprive the Legislature of the State of that general control over their citizens which was before possessed. It still has authority to amend their charters, enlarge or diminish their powers, extend or limit their boundaries, consolidate two or more into one, overrule their legislative action whenever it is deemed unwise, impolitic, or unjust, and even abolish them altogether in the legislative discretion, and substitute those which are different. The rights and franchises of such a corporation, being granted for the purposes of government, can never become such vested rights as against the State that they cannot be taken away; nor does the charter constitute a contract in the sense of the constitutional provision which prohibits the obligation of contracts being violated. * * * Re-

straints on the legislative power of control must be found in the Constitution of the State, or they must rest alone in the legislative discretion."

In *Tippecanoe County v. Lucas,* 93 U. S., 108, 114, 23 L. Ed., 822, the county resisted the enforcement of a statute diverting to another purpose property acquired by the county under authority of law, and after adverting to the fact that the statute would be clearly unconstitutional when applied to a transaction between the State and a private individual, the Court had the following to say as to the different situation arising out of a transaction between the State and a county: "But between the State and municipal corporations, such as cities, counties, and towns, the relation is different from that between the State and the individual. Municipal corporations are mere instrumentalities of the State, for the convenient administration of government; and their powers may be qualified, enlarged, or withdrawn, at the pleasure of the legislature."

In the opinion of the Court in *Mt. Pleasant v. Beckwith,* 100 U. S., 514, 524, 25 L. Ed., 699, it is said: "Institutions of the kind, whether called cities, towns, or counties, are the auxiliaries of the State in the important business of municipal rule; but they cannot have the least pretension to sustain their privileges or their existence upon anything like a contract between themselves and the legislature of the State, because there is not and cannot be any reciprocity of stipulation between the parties. and for the further reason that their objects and duties are utterly incompatible with everything partaking of the nature of compact."

On the same subject in *Trenton v. New Jersey,* 262 U. S., 182, 43 S. Ct., 534, 536, 67 L. Ed., 937, 29 A. L. R., 1471 (quoting from an earlier case, *Hunter v. Pittsburgh,* 207 U. S., 161, 28 S. Ct., 40, 52 L. Ed., 151), the Court thus stated the applicable principles: "The number, nature and duration of the powers conferred upon these corporations and the territory over which they shall be exercised rests in the abso-

lute discretion of the state. Neither their charters, nor any law conferring governmental powers, or vesting in them property to be used for governmental purposes, or authorizing them to hold or manage such property, or exempting them from taxation upon it, constitutes a contract with the state, within the meaning of the federal Constitution. The state, therefore, at its pleasure may modify or withdraw all such powers, may take without compensation such property, hold it itself, or vest it in other agencies, expand or contract the territorial area, unite the whole or a part of it with another municipality, repeal the charter and destroy the cui poration. All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest. In all these respects the state is supreme and its legislative body, conforming its action to the state Constitution, may do as it will, unrestrained by any provision of the Constitution of the United States. * * * The power is in the state and those who legislate for the state are alone responsible for any unjust or oppressive exercise of it."

State money appropriated or apportioned to the use or benefit of a county is no more the county's property protected by contract against the diversion by the Legislature to some other use or purpose, than State funds appropriated to the use of any of the ordinary departments of the State government, and authorities to this effect might be multiplied, but the foregoing are deemed sufficient to illustrate the principle, and to indicate the fundamental unsoundness of the theory upon which the county's contention is based.

The county also makes the additional contentions that the provisions of the State Appropriation Acts authorizing the State Highway Department to purchase the bonds of the county and hold them as a claim against the county, and the further provisions levying a tax of two mills on the taxable property of Chesterfield County inserted in the Appropriation Act of 1931 and the State Appropriation Acts for subsequent

years, are unconstitutional and ineffective for the following alleged reasons: (a) They violate Article 3, Section 17, of the State Constitution providing that every Act shall relate to but one subject, which shall be expressed in the title; (b) they attempt to enlarge the obligations of a contract between the county and the State Highway Department and attempt to create a claim against the county in favor of the department; (c) they violate Article 1, Section 14, of the State Constitution providing that in the government of the State the legislative, executive and judicial powers of the government shall be forever separate and distinct from each other, and that no person or persons exercising the functions of one of such departments shall assume or discharge the duties of any other, because they invade the province of the judiciary and attempt to legally determine that the highway department has a claim against the county, and to provide a remedy for the collection thereof; (d) no property tax can legally be collected to be applied to the payment of these bonds, because the creation of the bonded indebtedness was not submitted to the people at an election held for that purpose, and the issue of bonds exceeded the constitutional limitation of eight per cent. imposed by Article 10, Section 5, of the State Constitution. The defendant, J. F. McBride, makes the additional contention in relation to the levying of the tax of two mills that it violates Article 10, Section 3, of the State Constitution providing as follows: "No tax shall be levied except in pursuance of a law which shall distinctly state the object of the same; to which object the tax shall be applied."

These additional contentions seem to be unsubstantial, and at least some of them are probably necessarily disposed of by the conclusions already stated, but, nevertheless, they will be briefly considered in the light of several well-settled principles, which perhaps should be referred to.

The General Assembly has a right to pass any legislation deemed beneficial to the State, and to create such agencies as it deems necessary or expedient to

carry out its purposes, unless expressly prohibited by the Constitution; and a statute will, if reasonably possible, be construed so as to render it valid, and it will not be declared unconstitutional, unless shown to violate the Constitution clearly and beyond reasonable doubt. *Clarke v. South Carolina Public Service Authority et al.,* 177 S. C., 427, 181 S. E., 481. The constitutionality of an Act will not be passed upon, unless necessary to the decision of the case. *Ex Parte Florence School,* 43 S. C., 11, 20 S. E., 794; *Butler v. Ellerbe,* 44 S. C., 256, 22 S. E., 425; *State v. State Board of Canvassers,* 79 S. C., 414, 60 S. E., 967; *Sanders v. Atlantic Coast Line R. Co.,* 114 S. C., 164, 103 S. E., 564. The constitutionality of an Act cannot be questioned by one whose rights are not invaded and injuriously affected thereby, and its constitutional invalidity can be taken advantage of only by those who have a right to question the validity of the Act. *Ex Parte Florence School, supra; Jellico v. Commissioners of State Elections,* 83 S. C., 481, 65 S. E., 725.

In determining the sufficiency of the title of an Act to meet the requirements of Article 3, Section 17, of the Constitution, the following statement from the opinion of the Court in *Lillard v. Melton,* 103 S. C., 10, 87 S. E., 421, 423 (approved in many later cases) affords a useful guide: "In many cases, it has been held, in view of the purpose of this provision of the Constitution, that it should have a liberal construction, so as not to defeat or embarrass legislation by compelling separate enactments on every phase of a general subject of legislation, or with regard to every matter incident thereto or promotive thereof. When the general subject is expressed in the title, any details of legislation which provide the means, methods, or instrumentalities which are intended to facilitate the accomplishment of the general purpose, and are germane to it, may be embraced in the body of the act without violating this provision of the Constitution."

The general purpose disclosed by the State Appropriation Acts in question is to finance the operations of the State government, which necessarily carries with it any needed or desirable regulation of the fiscal affairs of the State, and this purpose is without doubt properly and adequately expressed in the title of all the Appropriation Acts from 1930 to 1936, inclusive. While the titles of the Acts of 1932, 1933 and 1934 expressly refer to the purchase by the State Highway Department of the bonds of Chesterfield County, yet the titles of the Acts for the other years do not. A matter so vitally concerning the State and its credit as financing the redemption of defaulted bonds of Chesterfield County, a subdivision or arm of the State government, by having the highway department to purchase them from the holders, would seem to be germane or incident to or promotive of the financing of the State government and the regulation of its fiscal affairs, and therefore within the scope of the general purposes of the Acts; but be that as it may, neither Chesterfield County nor any property owner or taxpayer of the county can be heard to complain of the unconstitutionality of this provision of the Acts, because no right is taken away or injury done. If the bonds are valid obligations of the county, it cannot possibly make any difference to the county or its taxpayers who holds them, whether it be the State Highway Department or the original purchasers.

It probably must be admitted that the titles of the Acts of 1931-1936, inclusive, fail to disclose any purpose to provide for a special tax of two mills on the property in Chesterfield County. They only indicate that a State tax will be levied, and the Constitution itself in many of its provisions treats State taxes and county taxes as distinctly different things, which also accords with common understanding and practice. Nevertheless, this is immaterial in this case, because even if the provision in question fails to meet the requirements of Article 3, Section 17, of the Constitution, there is no party to the cause who has any right to

make the question. Obviously Chesterfield County, a governmental subdivision of the State, has no right to raise the question in any event, although in a proper case it might be raised by one of its taxpayers, and doubtless for that reason, J. F. McBride, a property owner and taxpayer of Chesterfield County, has been made a party to the cause in his own right and in behalf of all other property owners and taxpayers of the county. It is not shown, however, or even claimed, that J. F. McBride has paid the tax under protest, so as to entitle him to recover the amount paid, or that he has unsuccessfully invoked the concurrent remedy of relief through the Tax Commission provided by Section 2427, Code 1932, and he only seeks an injunction against the tax.

It is true that a taxpayer may enjoin the collection of an illegal tax, provided he is afforded no adequate legal remedy against the exaction (*Ware Shoals Mfg. Co. v. Jones,* 78 S. C., 211, 58 S. E., 811; *Santee River Cypress Lumber Company v. Query et al.,* 168 S. C., 112, 167 S. E., 22; *Federal Land Bank of Columbia v. State Highway Department,* 172 S. C., 174, 173 S. E., 284), but Sections 2846, 2847, Code, 1932, provide a full, adequate and complete legal remedy by payment under protest and a suit to recover the amount so paid, and Section 2427, Code, 1932, provides an adequate, cumulative, and concurrent remedy through application to the Tax Commission. *Bank of Johnston et al. v. Prince, County Treas.,* 136 S. C., 439, 134 S. E., 387. These remedies having been provided, the provisions of Section 2845, Code, 1932, to the effect that the collection of taxes shall not be stayed or prevented by injunction, become fully operative and must be given effect. That the legal remedies thus provided are adequate and exclusive has been so frequently decided as to render the citation of authority superfluous. While it has been held that an illegal assessment for taxation may be enjoined (*Bank of Johnston et al. v. Prince, supra*), yet the taxpayer in this case could have no standing to enjoin an assessment for tax-

ation for the years 1931 to 1936, inclusive, presumptively already made, since the time to assess taxes for the years 1931 to 1936 is long past; and even if the tax has not already been assessed for those years, as it ought to have been, yet there is no allegation or showing of any threat or purpose to make the assessment now.

There is no party before the Court who can properly be heard to question the constitutionality of these provisions of the State Appropriation Acts, even if they are not constitutional, since it does not appear that they invade any right which any party to the cause is entitled to assert or to have protected in this case. The constitutional validity of the provisions under attack is, therefore, an academic question, and a decision on the objections made is not necessary to the disposition of this case.

The conclusions above stated equally apply to the separate and additional contention of the defendant, J. F. McBride, that the provisions of the State Appropriation Acts imposing a two-mill tax, violate Article 10, Section 3, of the Constitution for the alleged reason that the object of the tax is not stated; but in any event it would seem to require a highly technical and refined construction of the Acts to say that the object is not reasonably indicated to be to reimburse the highway department for the bonds taken over by it.

The objection that these provisions of the Appropriation Acts attempt to enlarge the obligations of a contract, and create a new claim against the county, and the objection that they violate Article 1, Section 14, of the Constitution, because they constitute an attempt by the legislative department to exercise judicial powers, are necessarily foreclosed against the county, and shown to be untenable, by conclusions already stated. As already shown, on account of the special relations existing between the State and the county, a subdivision or arm of the State government, no such contract relation has ever arisen as could properly be said to be unlawfully enlarged or impaired, in the sense that

a private contract might be enlarged or impaired, by anything that the General Assembly has done by any of the legislation involved in this cause; and in thus regulating the mutual relations and fiscal affairs of its subordinate governmental agencies the General Assembly is plainly exercising legislative and not judicial powers.

It seems unnecessary to enter upon an extended discussion of the further suggestion that no property tax can legally be collected to be applied to the payment of the bonds, because the creation of the bonded indebtedness was not authorized by a vote of the electors of the county, and because the issuance of the bonds caused the bonded indebtedness of the county to exceed the constitutional limitation of eight per cent. imposed by Article 10, Section 5, of the Constitution. There is no provision of the Constitution requiring an issue of bonds by a county to be submitted to a vote of the people. *Carrison v. Kershaw County,* 83 S. C., 88, 64 S. E., 1018; *Lillard v. Melton,* 103 S. C., 10, 87 S. E., 421; *Graham v. Ervin,* 114 S. C., 419, 103 S. E., 750. That a tax may be authorized, consistently with the Constitution, for the payment of bonds of this character, issued pursuant to reimbursement agreements with the State Highway Department, though they cause the constitutional limit as to the amount of bonds to be exceeded, seems to be definitely settled by the following cases: *Sullivan v. City Council,* 133 S. C., 189, 133 S. E., 340; *Briggs v. Greenville County,* 137 S. C., 288, 135 S. E., 153; *Evans v. Beattie,* 137 S. C., 496, 135 S. E., 538; *State ex rel. Richards v. Moorer,* 152 S. C., 455, 150 S. E., 269; *Haddon v. Cheatham,* 161 S. C., 384, 159 S. E., 843; *Crawford v. Johnston,* 177 S. C., 399, 181 S. E., 476.

The statement that no property tax "can ever be levied to meet these obligations," used by the Court in *Briggs v. Greenville County, supra,* and much relied upon by the plaintiff in this case, plainly refers to a State tax and not a county tax. The statement of the Court was undoubtedly correct,

because the Act under consideration did not provide for any State tax. There is also a *dictum* in the decree of the Circuit Judge (affirmed without formal opinion by the Supreme Court) in *Barnwell v. Matthews,* 132 S. C., 314, 128 S. E., 712, to the effect that a county taxpayer can never be required to pay any part of an obligation made pursuant to a reimbursement agreement with the State Highway Department by authority of the "Pay-As-you-Go" Act of 1924, but the statement is a mere casual one, not necessary to the decision of the case, and in any event must be regarded as inconsistent with the later cases above cited.

Whatever may be the correct view as to the proper interpretation of the decisions in the cases above referred to, the question is wholly an academic one in so far as it relates to Chesterfield County. By Act approved February 19, 1931 (37 Stat., 104), an amendment to Article 10, Section 5, of the Constitution, imposing the eight per cent. limitation on the bonded indebtedness of counties, was ratified and made a part of the Constitution. This amendment will be found in the Constitution as incorporated in the Code of 1932, and it provides as follows: "All notes and bonds heretofore issued by Chesterfield County and now outstanding and unpaid are hereby validated, and the General Assembly may authorize the said county to issue its bonds for the purpose of paying, funding or refunding the said outstanding notes or bonds, notwithstanding any limitations or restrictions contained in this Constitution." This amendment is retroactive in its effect and renders the bonds valid from the time they were issued and sold, even though they then exceeded the constitutional limitation. *Robinson v. Askew,* 129 S. C., 188, 123 S. E., 822. These bonds having been thus validated, of course there can be no valid constitutional objection to the imposition of a tax for their payment.

While for the reasons hereinbefore indicated the county is not entitled to the relief it asks, yet at the same time it seems clear that the State Highway Department is retaining

and withholding from cancellation by the county more bonds than can be justified. Out of each installment of $40,000.00 of bonds purchased by the highway department it has surrendered to the county for cancellation $15,000.00, which is 15000/40000 of $40,000.00, representing the proportionate part of the entire $400,000.00 actually remitted to the highway department by the county treasurer. This is upon the theory that the county has advanced under the reimbursement agreement only the $150,000.00 remitted by the county treasurer, which is not stricly accurate. The Act approved March 25, 1929 (36 Stat., 1042), assigning the rights of Chesterfield County to the money remaining on deposit in the Bank of Cheraw and Chesterfield County to the credit of the county treasurer at the time of the bank's insolvency, as well as to all dividends payable or to become payable thereon, after reciting the failure of the county to advance all the funds required by its reimbursement agreement with the State Highway Commission, provides as follows: "All sums, except as otherwise provided herein, received by the State Highway Commission by reason of any of the above assignments, shall be applied on the contract between the Commission and Chesterfield County as an advancement of funds to the State Highway Commission under the said contract." Section 1. The exception referred to relates to the expense of certain litigation, and it has no relevancy here.

It is undisputed that the State Highway Department has received under its assignment $36,250.00 in dividends on the bank deposit, and giving any effect to the plain and mandatory language of the above-quoted provision of the Act of 1929, it must be deemed that Chesterfield County has advanced to the highway department under the reimbursement agreement $186,250.00 instead of $150,-000.00 as the highway department has assumed. This being so, the part of the bonds which the highway department is required to surrender to Chesterfield County for cancellation is 186250/400000 instead of 150000/400000. It is true that

the highway department has given the county credit for $36,250.00 on the account which it carries against the county on its books, and while in the long run the result may be substantially the same, yet this is not in exact accordance with the rights of the parties.

Summarizing the result of the conclusions hereinbefore stated, the State Highway Department is required to pay all interest on the issue of $400,000.00 of bonds of Chesterfield County accruing since March 14, 1929, the date of the passage of the Act requiring the highway department to assume the interest payments on these bonds, and it is also liable for and required to pay 186250/400000 of the principal of the entire issue of $400,000.00 and to surrender to Chesterfield County for cancellation that proportion of all the bonds heretofore or hereafter purchased. Since judgments appear to have been obtained on a portion of the bonds before they were refinanced through the highway department, and the department was required to pay $928.00 assessed as costs, this amount is a proper charge on the account against Chesterfield County appearing on the books of the State Highway Department. Chesterfield County in turn is entitled to have credited on the account the sum of $4,959.12, the proceeds of the two-mill tax collected during the year 1931 and remitted to the State Highway Department. The account as it should properly appear on the books of the State Highway Department of course could be stated formally, but a formal statement of the account in this report is not deemed of any consequence, since it may be so readily stated by adjusting the few items involved to the conclusion herein stated.

The effect of these conclusions, if accepted by the Court, upon the taxpayers of Chesterfield County is very regrettable. Being without any personal responsibility for the situation in which they are placed, doubtless they deserve sympathetic and liberal consideration, but if the law has been properly interpreted the Court is powerless to relieve them to any greater extent. While perhaps not a substantial consolation

they may at least feel assured that their cause has been presented with extraordinary zeal and ability, and that the contentions made in their behalf have been given prolonged and painstaking consideration.

It is, therefore, recommended that the rights of the parties be adjudged to be as herein stated, that due provision be made for giving effect to these rights, and that in all other respects the complaint be dismissed.

Respectfully submitted,

A. F. Woods,<br>
<em>Referee.</em>

*Messrs. C. L. Hunley, James E. Leppard* and *P. A. Murray, Jr.,* for appellants,

*Messrs. John M. Daniel, Attorney General, J. Ivey Humphrey* and *M. J. Hough, Assistant Attorneys General,* for respondent;

July 7, 1939.

The opinion of the Court was delivered by MR. CHIEF JUSTICE STABLER.

This action was commenced on October 13, 1936, and was brought by Chesterfield County to require the State Highway Department to turn over to it for cancellation certain bonds theretofore issued by the county under a reimbursement agreement with the department for highway construction. While this was the main purpose of the suit, other relief was also asked for. J. F. McBride was allowed on

motion to intervene as a party defendant in his own right and in behalf of all other property holders and taxpayers of the county. By consent, the cause was referred to A. F. Woods, Esq., as Special Referee, with directions to take the testimony and report to the Court on all issues of law and fact. This he did in due time, his findings and recommendations being favorable in the main to the contentions of the State Highway Department. On exceptions by the plaintiff and the defendant McBride, the matter was heard by his Honor, Judge Dennis, who confirmed the report in all particulars and made it the judgment of the Court.

From a careful study of the case as a whole, and especially so as to the questions raised by the exceptions and the argument of counsel thereabout, we are convinced that the Circuit Judge was right in the conclusions reached by him. The Special Referee clearly and ably discusses the contentions of the respective parties and correctly disposes of them under the law and the facts. His full treatment of every phase of the case makes it unnecessary to add anything to what he has said. We adopt his report as the opinion of the Court, and direct that it be incorporated in the report of the case.

The judgment of the Circuit Court is affirmed.

Messrs. Justices Bonham, Baker and Fishburne and Mr. Acting Associate Justice G. B. Greene concur.

Mr. Justice Carter did not participate on account of illness.